TEXAS CO. v. WIMBERLY et ux. (No. 450.)

(Court of Civil Appeals of Texas. Beaumont. May 20, 1919.)

1. BANKS AND BANKING ⬤⇒90 — BANK AS AGENT FOR RECEIPT OF MONEY ON LEASE.

A bank was the sole agent of the lessor for the reception of money under a lease providing that it should terminate if lessee should fail to begin operations for an oil well on or before a certain date "unless the lessee on or before that date shall pay or tender to the lessor or to the credit of the lessor in the F. Bank, the sum of $26."

2. WITNESSES ⬤⇒331½ — IMPEACHMENT — FOUNDATION.

It is error to admit over objection impeaching testimony when no predicate therefor has been laid.

3. EVIDENCE ⬤⇒71, 89—PRESUMPTION—REBUTTAL—DELIVERY OF LETTER.

There is a presumption of fact that a letter properly addressed and mailed was delivered in due course of mail to the addressee, but such presumption is subject to rebuttal by proof of nondelivery, or by proof of delivery out of due course of mail.

4. EVIDENCE ⬤⇒114—ADMISSIBILITY—FACTS TENDING TO SHOW DATE LETTER WAS RECEIVED.

In an action involving whether a bank had received a draft by mail on or before May 1st, letter containing draft being found in bank some time later, no one knowing when letter had arrived, evidence that many persons other than plaintiff had called at bank demanding delivery of checks contained in the same letter was material; the banker undertaking to recite facts to demonstrate that his attention before May 1st was called to the loss or delay of the letter; the fact that many persons were demanding checks tending to make bank employés observe all mail until the envelope was found, and tending to show that the letter must have arrived and been mislaid prior to May 1st.

5. EVIDENCE ⬤⇒501(8) — OPINION — BASIS —TIME OF RECEIVING LETTER.

In an action involving whether or not a bank had received a letter on or before a cer-

tain date, where an officer of the bank, who did not see the letter until eight days after such date, testified that his best judgment was that the letter arrived prior to such date, it was error to sustain an objection to a question, "State to the jury your reasons upon which you base your judgment" that the letter arrived prior to such date.

Appeal from District Court, Shelby County; Daniel Walker, Judge.

Suit by T. W. Wimberly and wife against the Texas Company and the Producers' Oil Company. From an adverse judgment, the first-named defendant appeals. Reversed and remanded.

T. J. Lawhon, of Houston, and Davis & Davis, of Center, for appellant.

Sanders & Sanders, of Center, for appellees.

BROOKE, J. On June 26, 1918, appellees herein, T. W. Wimberly and wife, Phœbe Wimberly, as plaintiffs, filed in the district court of Shelby county, Tex., an action against the Producers' Oil Company and the Texas Company to cancel a certain mineral lease contract covering 104 acres of land in Shelby county, Tex. Said contract was executed by appellees to F. E. Kistler April 29, 1916, and for valuable consideration was assigned to and became solely the property of the Texas Company in November, 1917.

The following is a sufficiently comprehensive statement of the grounds of forfeiture asked by appellant:

(1) That the said mineral lease contract provided, unless a well was begun before the 1st day of May, 1918, the lease should terminate, unless the lessee on or before that date should pay to the lessor, or tender to the lessor's credit in the Farmers' State Bank at Center, Tex., the sum of $26, which, when paid, and however paid, should defer the time limit within which drilling might be done one year from said date, and that neither of said defendants on or before said date had begun drilling a well or had paid the plaintiffs, or had tendered to their credit in said bank, the said sum of $26.

(2) That said mineral lease contract is unilateral in its terms, and void for want of mutuality.

(3) That said mineral lease contract was assigned without the knowledge or consent of plaintiffs.

The pleadings conclude with the prayer for judgment canceling said lease contract, and removing cloud from title.

Defendants answered by a general denial; admitted the execution of the contract, and that the same was duly assigned to, and solely owned by, defendant the Texas Company, and that in the month of April, 1918, and prior to the 1st day of May, they duly and properly tendered to the Farmers' State Bank of Center, Tex., to the credit of plain-tiffs, the said sum of $26, in compliance with the terms of the lease, which payment did, as a matter of law, extend and continue valid said lease to May 1, 1919; averred that said contract was supported by a valuable consideration in all its parts, and was therefore not void for want of mutuality; and concluded with a prayer for a judgment in their favor, and for general and special relief.

On the trial the Producers' Oil Company passed out of the case by an agreement of the parties that the mineral lease contract had been properly assigned for a valuable consideration to the defendant the Texas Company; and on the sole issue submitted to the jury—whether the voucher issued by the Texas Company in payment of said $26 was received by the Farmers' State Bank of Center on or before May 1, 1918, to which said jury answered "No"—the court rendered judgment canceling said mineral lease contract, and removing cloud from the title of plaintiff's said land, but in said judgment expressly found and decreed that said mineral lease contract was properly assigned to defendant the Texas Company, and that the same was not unilateral in terms and void for want of mutuality.

Defendant the Texas Company immediately filed its motion for new trial, praying that said judgment be set aside. The court overruled said motion, and, upon defendant properly excepting thereto and giving notice of appeal to this court, granted said defendant 90 days in which to prepare and file statement of facts and bills of exception. Defendant the Texas Company in due time filed its appeal bond, and now properly brings this cause before the court for review on appeal.

From the foregoing it will be seen that the trial in the lower court narrowed to the one issue whether the Texas Company's voucher in payment of said rent reached the depository bank at Center on or before May 1, 1918. This issue was submitted to the jury and found by it in plaintiffs' favor. The appellant is attacking this finding and the judgment of the court based thereon, contending: (1) That the court erred, to the prejudice of appellant, in the admission of certain testimony before the jury; and (2) that said finding and judgment is wholly unsupported by the evidence.

Appellant's first, second, and third assignments of error will be considered together, and are as follows:

(1) "The court erred in permitting the plaintiffs' witness Ed Boles to testify, over the objection of defendant, that he was present with the plaintiff Wimberly, and heard one F. C. Powell make certain statements to said Wimberly, said testimony being as follows:

" 'Q. I believe that you stated that you heard a conversation between Mr. Powell and Mr. Wimberly? A. Yes, sir; I did.

" 'Q. Do you know when, what date that was?

A. That was the 6th day of May, if I ain't mistaken; I know it was the 6th day of May.

"'Q. Had you gone there before yourself? A. Yes, sir.

"'Q. Had you gone to the bank—don't tell what Mr. Powell said, but had you gone about a matter of your own? A. I had.

"'Q. Well, now, at the time you were there, did you hear Mr. Powell make any statement to Mr. Wimberly in regards to whether his (Wimberly's) money under the lease was there in the bank or not? A. He said it was not there.

"'Q. Then at any other time did you hear Mr. Powell state to Mr. Wimberly when the check came in? A. Two or three days later, he said; Wimberly asked him, and he said two or three days later from that. He says, I just called for that check Monday, and it wasn't there; well, he says, about two or three days later, about two days later, as my memory serves me, he said about two days later.

"'Q. He said to Wimberly, when you were there with him, that the money was not there? A. He did; he told him it wasn't there.'

"(1) Because the statements of F. C. Powell about which the witness testified were ex parte, hearsay statements, in no wise binding defendant, and therefore not admissible in evidence against it, and said testimony is prejudicial to the rights of this defendant, in that it seeks to bind defendant by the hearsay declarations of one F. C. Powell concerning a material inquiry in this case, to wit, the date when said Texas Company check and voucher arrived at said bank.

"(2) Because said testimony, if offered as original evidence, is not binding or admissible against defendant, because said defendant is in no sense bound by the statements or declarations of the said F. C. Powell, and, if said testimony is offered for the purpose of impeachment, it is not admissible as such, because said Powell had not been upon the stand in this cause, and no predicate had been laid for introducing impeachment testimony against him."

(2) "The court erred in permitting the plaintiffs' witness Ross Wilson to testify, over defendant's objection, that he was present with the plaintiff Wimberly, and heard one F. C. Powell make certain statements to said Wimberly, said testimony being as follows:

"'Q. Were you present on the 2d and 6th day of May, when Mr. Wimberly went to the Farmers' National Bank—the Farmers' State Bank, asking to know in regard to his lease money? A. Yes, sir.

"'Q. Did you hear what Mr. Powell told him? A. Yes, sir.

"'Q. What did Mr. Powell tell him? A. He told him it wasn't there.

"'Q. Did he tell him that on the 2d and on the 6th? A. Yes, sir; he did.'

"(1) Because the statements of F. C. Powell about which the witness testifies were ex parte, hearsay statements, in no wise binding defendant, and therefore not admissible in evidence against it, and that said testimony is prejudicial to the rights of this defendant, in that it seeks to bind defendant by the hearsay declarations of one F. C. Powell concerning a material inquiry in this cause, to wit, the date when said Texas Company check and voucher arrived at said bank.

"(2) Said testimony, if offered as original testimony, is not binding or admissible against defendant, because said defendant is in no sense bound by the statements or declarations of the said F. C. Powell, and, if said testimony is offered for the purpose of impeachment, it is not admissible as such, because the witness F. C. Powell has already testified in the cause, and no predicate has been laid for introducing impeachment testimony against him."

(3) "The court erred in permitting the plaintiffs' witness Jesse Perminter to testify, over defendant's objection, that he was present with the plaintiff Wimberly, and heard one F. C. Powell make certain statements to said Wimberly, said testimony being as follows:

"'Q. Mr. Perminter, were you present, at any time when Mr. Wimberly went to the Farmers' State Bank? A. I was.

"'Q. At what time was it? A. It seems to me like it was the 2d day of May.

"'Q. Did Mr. Wimberly ask to know about some money on a lease? A. He did.

"'Q. Where? A. At the Farmers' State Bank.

"'Q. Here at Center? A. Yes, sir.

"'Q. Who answered him? A. It seems to me like it was Mr. Powell.

"'Q. What did Mr. Powell tell him? A. He told him it wasn't there.'

"(1) Because the testimony of F. C. Powell about which witness testified were ex parte, hearsay statements, in no wise binding defendant, and therefore not admissible in evidence against it, and said testimony is prejudicial to the rights of this defendant, in that it seeks to bind defendant by the hearsay statements of one F. C. Powell concerning a material inquiry in this cause, to wit, the date when said Texas Company check and voucher arrived at said bank.

"(2) Said testimony, if offered as original evidence, is not binding or admissible against defendant, because said defendant is in no wise bound by the statements or declarations of said F. C. Powell, and, if said testimony is offered for the purpose of impeachment, it is not admissible as such, because the witness F. C. Powell had already testified in this cause, and no predicate had been laid for introducing impeachment testimony against him."

The propositions under these assignments are that the court erred in permitting the witnesses Ed Boles, Ross Wilson, and Jesse Perminter to testify to statements of F. C. Powell to appellee Wimberly, not in the presence of appellant, because the record demonstrates that F. C. Powell, in making said statement, was appellee's agent, and therefore his statements were hearsay and prejudicial, and that the court erred in permitting the witnesses Boles, Wilson, and Perminter to testify to statements of F. C. Powell, because, if said statements were offered, not as original, but as impeaching, testimony, it was error, since no predicate had been laid therefor.

It seems that the Farmers' State Bank of Center was the depository bank mentioned in the lease contract. The following provision in the lease appears with reference thereto.

"If operations for the drilling of an oil or gas well are not begun on said land on or before the 1st day of May, 1918, this lease shall terminate as to both parties, unless the lessee on or before that date shall pay or tender to the lessor or to the credit of the lessor in the Farmers' State Bank at Center, Tex. (which shall continue as the depository regardless of change in ownership of the land), the sum of twenty-six and no/100 dollars, which payment or tender may be made by the check or draft of the lessee, and, however made, shall operate to confer on the lessee the privilege of deferring the time limit for one year from said date."

F. C. Powell, during all this transaction, was the active vice president of the Farmers' State Bank at Center, Tex. The alleged conversation occurred between Powell and Mr. Wimberly in the Farmers' State Bank at Center, in the presence of Boles, Wilson, and Perminter. The record of Powell's testimony shows no predicate for impeachment was laid while he was on the stand. Objections were duly made, and bills of exception reserved to the introduction of said testimony by defendant's bills of exception.

It would seem that only two theories can be suggested why the court, over the objections of appellant, permitted said witnesses to testify to the declarations of F. C. Powell: (1) That Powell was appellant's agent; and (2) that such declarations were admissible for impeachment.

[1] It is obvious from the court's qualifications of bills of exception that the court admitted such declaration on the theory that Powell was appellant's agent, or a joint agent of both parties. Looking to the language of the lease contract for the relation sustained by the bank and its officers to the parties thereto, we find that the contract shall terminate in failure to begin operations for a well on or before May 1, 1918, "unless the lessee on or before that date shall pay or tender to the lessor or to the credit of the lessor in the Farmers' State Bank at Center, Tex., the sum of twenty-six and no/100 dollars, which payment or tender may be made by check or draft of the lessor." Evidently, from this language, the bank stands in the place of the lessor, and receives for him the money to be paid by the lessee for certain privileges under said contract. When the check or draft or money is paid or tendered to the bank, the lessee can exercise no further ownership or control over it; it is the lessor's. It is both paid to and received by the bank for the lessor. Viewed solely in the light of elementary principles of agency, we are unable to perceive what act or thing in this transaction the bank does as the agent for the lessee, or what act or thing it does that is not directly representative of the lessor. The same meaning is in the language of the contract construed by the court in Oil Co. v. Blanton (D. C.) 245 Fed. 979. The lease in that case required that the rental should be paid November 4, 1916, and lessor contended the money had not been paid until November 10, 1916. The court says:

"The lease, as to the payment of the rental, provided that it should be 'by check payable to the order of the parties of the first part, mailed to Alex Blanton, to Alcorn, Ky., or deposited to Alex Blanton's credit in W. B. Williams & Sons' Bank.' Thereby the bank was constituted the lessors' agent to receive payment of the rent, and it would seem that it was sufficient to make payment to it by check as well as to the lessors directly.

"* * * I think the evidence warrants the conclusion that the check for the rental was deposited on the 4th. But if it is open to claim that it was not, and that it was deposited on a later date, before or on the 10th, this was sufficient to save the forfeiture. The bank was the lessors' agent. It accepted the check as payment. The lessors had not theretofore notified it not to accept it after the due date. And after they received notice of the payment, they did not repudiate it, but acquiesced in it."

Notwithstanding the two cases may be distinguished on some issues, yet on the essential issue the analogy is perfect. We cannot escape the conclusion that upon language identical in its legal effect the court, in Oil Co. v. Blanton, holds that the depository bank is the sole agent of the lessor.

In Lafayette Gas Co. v. Kelsay, 164 Ind. 569, 74 N. E. 9, it is said:

"By the provisions of the contract the rentals were to become due on the 1st of January and July of each year, and it was stipulated that payment thereof might be made within 10 days after maturity, either direct to appellee, or by depositing the same in the Fairmount Bank, at Fairmount, subject to his order. The payment of the July installment of rent appears to have been made within the time prescribed, by appellant depositing the amount thereof in the bank designated to the credit and order of appellee; hence it was not material whether the deposit was made in lawful money, or in checks or drafts, as it was accepted by the bank, and the amount thereof placed to the credit of appellee, subject to his order, thereby enabling him to draw the money from the bank when he desired. Yoke v. Shay, 47 W. Va. 40, 34 S. E. 748; Friend v. Mallory, 52 W. Va. 53, 43 S. E. 114."

The holding of the court that the depositing of the check, though not lawful money, bound the lessor, must be on the hypothesis that the bank was acting as the lessor's agent, and that its act was his act. Especially is this true since the court cites in support of its holdings the two West Virginia cases of Yoke v. Shay and Friend v. Mallory.

In Yoke v. Shay the Supreme Court of West Virginia was dealing with a lease which required:

"Such payments may be made direct to the lessor, or deposited to his credit in Tyler County Bank, at Sistersville."

The defendants claimed that the lease had been forfeited by failure of the lessee to pay the rents due on the premises. The court said:

"Under the lease the plaintiffs began paying their rentals 41 days after its delivery, by deposit to the credit of the lessor in ·the Tyler County Bank, in Sistersville, according to the provisions of the lease. The lessor insists that the payment of rentals should have commenced within 30 days. While there are other minor questions urged, this is the only one presented worthy of the consideration of the court. Counsel attempt to object to the manner of deposit, because of the way in which the bank kept its books. With this the plaintiff has nothing to do. The lessor in the lease designated the bank as the proper depository, and all the plaintiff was required to do was to make the deposit and leave the payment to the bank as it saw fit. The certificate of deposit was proper as evidence thereof, and counsel's objection thereto is frivolous."

In the case of Friend v. Mallory, supra, the action was to enjoin the lessee from asserting any rights under a lease containing this statement in regard to the payment of rentals:

"Such payments may be direct to the lessor, or deposited to their credit in the Wirt County Bank."

The court, in summing up the lessor's contention, said:

" * * * And further denied that the Wirt County Bank was their agent for the purpose of receiving said draft deposited there by said lessees, and, even if it was so deposited, it was not a compliance with even the one-sided condition of the lease bearing date 23d of March, that the terms of the lease contemplated lawful money of the United States, and that the draft was not lawful money, and denied that the draft was ever passed to their credit by the bank. It is shown by the affidavit of G. W. Roberts, cashier of the bank, that on the 6th day of June, 1901, a deposit of that amount ($22.25) was made by the lessees to the credit of the said Robinsons. The terms of the lease from Robinsons· clearly make the Wirt County Bank the agent ·of the lessors to receive such payments; the lease providing that 'such payments may be direct to the lessors or deposited to their credit in the Wirt County Bank.' Whether the deposit was made in lawful money or in checks or drafts is not material, so the amount was placed to their credit in the bank. Yoke v. Shay, 47 W. Va. 40, 34 S. E. 748. The defendant, Friend, in his answer to bill of Mallory Bros. & Stewart also raises the question of the legality of payment into the bank and insists that the same should have been paid in lawful money. Said Roberts, cashier, a few days afterwards made a further affidavit, dated 31st of July, in which he states that 'said draft was not placed to the credit of said Robinsons by entering their names on the balance book nor otherwise except in cashier's check account, but a memorandum of the matter was made on a deposit slip which was placed in the cashier's check account and was carried in that way,' that neither of the Robinsons had any account in the said Wirt County Bank at that time, and they had never had a joint account opened in said bank to them except as stated; and affiant desired to qualify his former affidavit accordingly. The lessees, Mallory Bros. & Stewart, were not responsible for the manner in which the Wirt County Bank kept its accounts, nor was it material, or a matter of which the lessors could complain, as to whether a deposit was made to their credit in money, draft, or otherwise, so they had the benefit of the credit and could receive money ·upon it."

The court further says:

"The payment of the rental to be due June 23, 1901, was paid prior to that date into the bank designated in the lease as the agent to receive it. * * *"

[2] In our opinion, no authority is necessary for the proposition that it is error to admit, over objection, impeaching testimony when no predicate therefor has been laid. It cannot be contended that the evidence, for whatever purpose received, was harmless. The declarations of the witnesses were given to the jury as affirmative original evidence on the only issue of fact submitted to the jury, the answer to which is the sole basis of judgment in this cause, and therefore it must appear, ·aside from the presumption of injury, that its admission was prejudicial to appellant. The assignments are sustained.

The fourth and fifth assignments of error will be considered together, as follows:

(1) "The court erred in overruling, and not granting, the defendant's motion to instruct the jury to return a verdict in its favor, in that plaintiff's suit seeks to cancel a certain mineral lease contract, for the alleged reasons:

"(a) That the contract is not legally and properly assignable to the defendant and assignee, the Texas Company.

"(b) That said mineral lease contract is unilateral and void for want of mutuality.

"(c) Because defendant did not timely pay, under the terms of lease, certain rental or commutation money in order to continue said lease vital.

"Defendant shows to the court that said motion to peremptorily instruct the jury should be granted:

"(a) Because said lease contract, on its face, and as a matter of law, expressly authorizes its assignment to the defendant Texas Company.

"(b) Because said instrument, by its express terms, and under the undisputed testimony, is supported by a valuable consideration.

"(c) Because all the testimony and the great preponderance of the testimony establishes the fact that the Texas Company voucher or check, payable to the credit of the plaintiff, reached said Farmers' State Bank of Center on or before May 1, 1918, all of which is fully shown by defendant's bill of exception No. 1."

(2) "The court erred in rendering judgment for the plaintiff, in that this is an action to cancel a certain mineral lease contract, for the following reasons, as alleged by plaintiff:

"(a) That said contract on its face, as a matter of law, is unilateral and void for want of mutuality.

"(b) That said mineral lease contract does not permit its assignment to defendant the Texas Company.

"(c) That defendant has not timely paid the rental or commutation money stipulated in said lease in order to defer the privilege of drilling thereon on or before the 1st day of May, 1918.

"And defendant shows the court that the verdict is entirely unsupported by the law and the evidence, in this:

"(a) That said mineral lease contract, including all its rights and privileges, on its face and under the undisputed evidence, is supported by a good and valuable consideration, to wit, the sum of $52, the initial cash payment, and that therefore said contract is not void for want of mutuality.

"(b) That said mineral lease contract expressly provides and authorizes that it and the estate granted by it may be assigned in whole or in part, and therefore the Texas Company is the legal owner thereof, and entitled to all of its rights and privileges.

"(c) That all the evidence and the great preponderance of the evidence clearly establishes the fact that the check or voucher of the defendant the Texas Company, remitting to the depository bank named in said lease, Farmers' State Bank of Center, the rental or commutation money, was mailed to and received by said bank prior to the 1st day of May, 1918, and that said mineral lease contract is not subject to cancellation for failure to timely pay said money.

"Wherefore defendant shows the court that the judgment rendered herein is entirely unsupported by the law and the evidence."

These assignments are submitted together as presenting the same question of law— the insufficiency of the evidence to support the judgment of the court. Two other questions raised by said assignments—that said lease contract was properly assigned to appellant and was not unilateral and void for want of mutuality—were settled in appellant's favor by judgment of the court.

The propositions under these assignments are that the evidence is wholly insufficient to support the one and only issue of fact on which the court based the judgment, to wit, that the Texas Company's rental voucher was not received by the Farmers' State Bank at Center on or before May 1, 1918, and that the finding of fact on which the judgment is based, to wit, that the rental voucher was not received by said bank on or before May 1st, is so against the great preponderance of the evidence as to be manifestly wrong.

The following facts are stated in reference to a presumption that said voucher was received by said bank through the mail on or before May 1, 1918.

F. C. Powell testified as follows:

"Along about the 1st of May the Farmers' State Bank received a number of checks from the Texas Company. The check you have hand-ed me is dated April 22, 1918, issued by the Texas Company, and is in payment of the lease of T. W. Wimberly and wife. The Wimberly check was one of a bunch of some 40 or 50 similar checks which we received in one large envelope. I couldn't testify to the exact time that this batch of checks came. I have the envelope in which the checks came. It is postmarked, 'Houston, Apr 24 8 p. m. Tex. 1918.' It is addressed to 'Farmers' State Bank, Center, Texas,' and has a return card on the corner of it, 'The Texas Company, Producing Dept., Houston, Texas,' and has on it 54 cents of canceled postage stamps. The postage stamps were on the envelope when it came. I think it was first-class matter; it was sealed. Our bank frequently receives mail from Houston, and I know just about the length of time required for Houston mail to reach Center. In the due course of mail a letter mailed in Houston on April 24th would arrive in Center about the 26th. * * * The batch of checks which this envelope contained were first seen by me about the 7th of May. The envelope was then lying on my desk at the bank. I don't know how it got there."

Defendant, in connection with the witness' testimony, introduced in evidence the envelope in which the checks arrived, the size of the envelope being 9x12 inches, United States Envelope Company's No. 90, and shows the return card of the Texas Company, Producing Department, Houston, Tex., postmarked Houston, April 24, 1918, 8 p. m. addressed to the Farmers' State Bank, Center, Tex., and bearing postage stamps to the amount of 54 cents, canceled.

H. E. Norris testified as follows:

"I remember that we received from the Texas Company an envelope containing a lot of drafts. The envelope you have just shown me, I suppose, is the one in which the drafts came. If this envelope had come in the due course of mail, mailed on the 24th, in due course of mail it would have reached our bank on the 25th or 26th. * * * I am sure it had been there at the bank several days when I discovered it; it was among a lot of other papers."

On cross-examination he testified:

"I don't know whether I went for the mail the day I found them, or not; I know they did not arrive that day, because they had been there several days; they were dusty; the envelope showed to have been lying there two or three days, or several days."

J. D. Redditt testified:

"I am postmaster at Center, Tex. The postal regulations require that letters dropped in the mail shall be sent off on the first train that will get them to their destination the earliest. Before sending a letter off on the train the postmaster cancels the stamp and postmarks it. The postmark gives the date when it was mailed and the office where it was mailed. There is a regulation requiring postmasters to put the very date on a letter when it is mailed, that is, the hour, showing the date and the hour that it leaves the office, and you have got to send

it the most direct route that will get it to its destination. * * * I have the railway mail schedule gotten out on the 1st of March, and we have received no notice of change. It only shows trains carrying mail; and, according to this schedule, on May 23d Houston East & West Texas train No. 4 left Houston at 9 p. m., and got to Teneha at 4:23 a. m. A letter mailed according to postal regulations, postmarked 8 p. m., the date shown on that envelope, would have left Houston on that No. 4 train at 9 o'clock that night. That train left the Central Station at 9 o'clock; and, presuming that that train was on time, it would have reached Teneha at 4:23 a. m. the next morning, and would have reached Center at 9:23 the same morning it left Teneha."

On cross-examination he testified:

"The letter would have reached here according to the schedule just given, if it came straight through the way it is supposed to. I have known of letters being missent, marked 'Missent.' Whenever they go astray the postmaster marks them 'Missent' and heads them back the right way."

R. S. Sanders testified on cross-examination:

"This envelope has the proper postage on it, but we never noticed that; if we had, we would have opened it at the time we got it."

The lease contract, in reference to the payment of rentals, provides:

"If operations for the drilling of an oil or gas well are not begun on said land on or before the 1st day of May, 1918, this lease shall terminate as to both parties, unless the lessee on or before that date shall pay or tender to the lessor or to the credit of the lessor in the Farmers' State Bank at Center, Tex. (which shall continue as the depository, regardless of change in ownership of the land), the sum of twenty-six and no/100 dollars, which payment or tender may be made by the check or draft of the lessee, and, however made, shall operate to confer on the lessee the privilege of deferring the time limit for one year from said date. Thereafter, in like manner and upon like payments or tender of said amount, the time limit may be further deferred for additional periods of one year successively, provided always that this lease cannot be kept in force by such payments in the absence of drilling operations for a longer period than five years from the date last above set forth."

The facts show, at the most, that Wimberly did not receive the Texas Company's voucher when he called at the bank for it about May 2d and 6th, and that Mr. Powell, the bank's vice president, told him it was not there; that the mistake in saying it was not there was later discovered and corrected.

The appellee Wimberly testified as follows:

"Neither Kistler nor any one else paid or tendered to me any amount of money before the 1st day of May, 1918. On the 2d day of May I made inquiry at the Farmers' State Bank with regard to any deposit of any money there for me, and Mr. Powell, the cashier of the Farmers' State Bank, said it was not there. I went back to the Farmers' State Bank on the 6th day of May, 1918, and had another conversation with Mr. Powell; I called for the money, and he said it was not there. I also had a conversation with Mr. Ed Norris, assistant cashier of the Farmers' State Bank, at a date later than the 6th of May, several days after the 6th, and inquired of him if the money was there, and he said that he did not know. * * * Prior to this time, prior to the 8th day of May, I had been to the Farmers' State Bank on the 2d of May and also on the 6th of May, and asked Mr. F. C. Powell, the cashier, if there had been any money deposited for me under this lease, and he had told me there had not. They have never at any time tendered me any money in cash, nor, as far as I know, made deposit of any money in the Farmers' State Bank, nor anything else of any value there."

On cross-examination he testified:

"The first notice I received with reference to that check was the last part of April, and at that time I got a letter direct from the Texas Company stating that they had deposited the money. I haven't got the letter now. There are possibly some just like it. I looked for the one I got, and thought I had turned it over to my attorney, but when I got here I saw that I hadn't; it is at home, about the place. * * * On May 2d I called at the bank and asked Mr. Powell if there was any 'lease money' there for me, and Mr. Powell informed me that there was not. On May 6th I again called at the Farmers' State Bank, and again had a conversation with Mr. Powell. I just stepped up to the window and asked if the money was there, and he said it was not there. The next time I came back to town I brought this letter and pushed it in the window to Mr. Powell, and he read it over and looked up—he was busy with some notes, paper money, or something, anyhow, he was busy—he looked up over his specs. I pushed the check under the letter, and he opened it and read it and pushed it back under the window to me, and I asked him for an explanation, and he said: 'I couldn't tell you a thing about it, Tom, only the postmark was the 24th on the envelope,' he says, 'that's all I know about it.' I don't know whether the postmark was the 24th or not; that's what he said. * * * I wrote the letter to the Texas Company bearing date May 9th, and in reply, after I had written that letter, in a few days I received a letter from them, and that letter I carried to the Farmers' State Bank, and showed it to Mr. Powell, the vice president of the bank. Mr. Powell read the letter and pushed it back to me, and said that the envelope from the Texas Company in which those checks came was postmarked on April 24th, and that that was all he knew about it. * * * The first time when I went in, when I pushed the letter under, he looked up and talked a little short. He said, 'I don't know anything about it, only the postmark was the 24th, 1918, from the company,' the 24th of April."

Speaking of a conversation he had with Powell some four or five days later, he said:

"And carried me back in the back of the bank and talked. He didn't talk short that day; he said, 'Tom this money here, these checks, we don't know; we found them lying on our desk, and the postmark was the 24th,' the 24th of April, you understand. You understand that the money was due the 1st of May. He said that is when that was mailed out of Houston, and then he said the money might have been here the 1st day of May. I told him, 'You certainly ought to know,' and he says, 'I don't.' I asked, 'When did you find them?' and he says, 'I don't know; I couldn't tell you.' 'Well,' I says, 'you know when you mailed them out, the checks?' and he says, 'I don't remember.' I says, 'You remember me asking for the money?' He says, 'I don't remember,' and he says, 'That's all I remember about it.' Then he says, 'The money might have been here, and it might have been a mistake of the bank.' * * * When I gave this draft back to Mr. Powell I had called for the money on the 6th, it being three days before I delivered the draft back. I asked him when these checks or drafts came, and he says, 'I don't know; about two or three days ago;' and I says, 'Mr. Powell, don't say two or three days ago, for I called two or three days ago;' and he says, 'They came in about two days ago.' That's what he told me when I gave him the check back."

In this connection the witness admits that Mr. Powell explained to him the circumstances of the loss of the checks at the bank in this language:

"When I gave him the letter back that the company wrote me after I wrote the company, Mr. Powell told me that the envelope in which the checks came was postmarked April 24th, and that it had gotten thrown aside, and that they overlooked it, and didn't find it until you all had been in there inquiring for the checks. Possibly, if I remember, he told me, when I gave the check back to him, that the postmark was the 24th. At any rate, I understood from him, after I had inquired there on the 2d and 6th, that it wasn't there; and on the 9th of May he told me that the postmark on the envelope the checks came in was the 24th of April, 1918."

In this connection the witness Powell testified:

"My recollection is that I told Mr. Wimberly that the checks arrived at our bank prior to the due date. When Mr. Wimberly brought the check back I did not tell him that the checks had arrived two days prior. I told Mr. Wimberly that I believed the checks arrived prior to the 1st of May."

Continuing, Wimberly testified:

"He did not tell me what date he found the checks; he just said that the money came in about two days ago; he did not use the words 'showed up'; he just said that the money came about two days ago."

The witnesses Boles, Wilson, and Perminter testified that they heard a conversation between Wimberly and Powell about the 2d and 6th of May, and that Powell told Wimberly the money was not at the bank. The witness Boles says that "on the 9th Mr. Powell stated that the checks had come in 'two or three days ago.'" The witness Wimberly admitted that he had not complained about the performance of the contract, except the delay in the delivering of the check. Further, he testified:

"The check was returned to the Farmers' State Bank. The check was dated April 23, 1918. If it had been paid at the proper time, it was for the correct amount of the rental which I expected to receive up to the 1st day of May. Up until the 1st day of May, I wasn't expecting anything only that they would pay the money; I hadn't thought anything about being dissatisfied; the only thing that was unsatisfactory to me with reference to or pertaining to the lease was the fact that the $26 was not paid, according to the terms of the lease by the 1st day of May, 1918."

There were only three persons at the bank who received or handled its mail, Vice President Powell, Cashier Norris, and Bookkeeper Sanders. Sanders testified:

"The parties who go after the mail and receive the mail for the bank are Mr. Powell, Ed Norris, and myself; one of us would have gotten it."

These parties testified about the time of receiving of the envelope containing said checks at the bank. Powell testified:

"I am active vice president of the Farmers' State Bank of Center, Tex. I have been actively at work with that bank for about 12 years. Along about the 1st of May the Farmers' State Bank received a number of checks from the Texas Company."

And further:

"The batch of checks which this envelope contained were first seen by me about the 7th of May. The envelope was then lying on my desk at the bank. I don't know how it got there. * * * The contents of the envelope, that is, the checks, including the Wimberly check, had been the subject of discussion there at the bank, on account of inquiry having been made by Mr. Wimberly. I could not state whether or not the envelope, with these checks, arrived at our bank on or before the 1st day of May; my best judgment is that they arrived prior to the 1st of May."

In explanation of why the witness does not state the facts upon which he bases this judgment, it is proper to state that appellant undertook to have the witness state said reasons to the jury, all of which testimony was excluded by the trial court, as will be shown by subsequent assignments. We make this explanation here because it is not outside the record, and it explains a very serious omission of witness' testimony. He continued:

"I think I talked to Mr. Wimberly a time or two about the arrival of his lease money. I explained to Mr. Wimberly that the envelope showed that the checks had been mailed out in plenty of time to have arrived before the 1st of May, and in connection or in the course of the conversation I think I stated to him what my belief about the matter was."

On cross-examination he testified:

"I told Mr. Wimberly that I believed the checks arrived prior to the 1st of May. I don't know how long those checks remained in Houston, nor how long they remained on the way; I do not know positively what time they arrived at our bank; what I stated to Mr. Wimberly was not stated as a positive fact; it was just what I believed about it. I would not tell the jury positively that those checks arrived at the bank by the 1st of May, nor the 2d, 3d, 4th, nor any date, until I found them on my desk, about the 7th; I do not know that they arrived the day before; I don't know when they arrived. I don't know who went to the post office after the mail on the 7th; I don't know what mail was brought in on the 7th; I could not state positively that those identical drafts were not brought in on the 7th; I don't know that they left Houston the day they were postmarked, nor the following day, nor three days after. The envelope is postmarked Houston, the 24th. I don't know when they arrived at our bank."

When the envelope containing the checks was opened on the 7th of May, the voucher was not placed to the credit of Wimberly, through erroneous belief that it had to be indorsed by Wimberly first.

"At the time these checks or drafts were mailed out by us I thought it was necessary that they be indorsed by the parties to whom the money was due before they would be cashed by the Texas Company, and that was my reason for having them mailed out."

On cross-examination he testified:

"I sent this check to Mr. Wimberly, and Wimberly brought the check or voucher back to me; and when he brought it back to me I just put it away, and I let it stay put away for several days, and then placed it to his credit."
"This voucher was deposited to Mr. Wimberly's credit on the 23d day of May."

Norris testified:

"I have been cashier of the Farmers' State Bank of Center since January of this year. During April and May of this year I was the cashier. I remember that we received from the Texas Company an envelope containing a lot of drafts. The envelope you have just shown me, I suppose, is the one in which the drafts came. The drafts are what I would call voucher form. This draft was issued to the Farmers' State Bank for settlement of lease on some lands, and the rental is in favor of T. W. Wimberly and wife. They were the parties who made the lease. I don't remember how many vouchers were in that envelope. I suppose there were some 40 or 50, possibly more; I couldn't say; there was a lot of them. I think I opened the envelope. Parties had been inquiring for the checks for some time previous, for several days. I found the drafts on the desk near where I work. There were a good many papers on the desk, and the drafts were among them. Those drafts were in the bunch. If I noticed the envelope before I found it, I just glanced at it and supposed that it was about a matter from the Federal Reserve Bank at Dallas relative to the Liberty Loan, and Mr. Powell had been receiving quite a lot of that matter. I couldn't say just when the bank received that envelope and the drafts contained therein, among which was this draft to pay the rental of Mr. Wimberly's lease; that is, as to the exact date, I couldn't say; they had been there several days, I am sure, when we discovered them, because I think I noticed them lying around there; if we had just gotten them in, we would have noticed them. I expect that for a week prior to the time I found and opened the envelope people had been calling for the contents of that envelope. The people began calling for their checks right along about the 1st of May; I don't know whether it was before or on the 1st; the parties said they were to receive them on the 1st, by the 1st. I think I would have noticed the envelope if it had been received after the parties began calling for their lease money. Basing my judgment on those facts—of course, I couldn't say just when it was—I suppose the envelope containing those checks arrived at our bank somewhere in a day or two, two or three days, after they were mailed, anyway, because coming from Houston we usually get mail the following day after it leaves Houston, mailed at the post office in Houston. * * * If this envelope had come in due course of mail, mailed on the 24th, in due course of mail it would have reached our bank on the 25th or 26th; and if it had reached there after the people began inquiring for it, I would have noticed it. I am sure it had been there at the bank several days when I discovered it; it was among a lot of other papers; I discovered and opened this package and made a remark to Mr. Powell about the contents of it."

On cross-examination he testified:

"When we got those vouchers we never noticed about them being payable to the bank direct; we supposed we had to send them out to the parties for their indorsement, and we did so. I sent this identical voucher to Mr. Wimberly in this envelope; that is my writing. That was mailed at Shelbyville, according to this, on the 8th. Mr. Wimberly brought this voucher back to us, I don't remember the date, but a day or two after I mailed it out to him. As to where the voucher was all the time from the time Wimberly brought it back until we gave him credit for it, I suppose Wimberly mailed it back to the company. We got it from the company the second time. We did not send it back to the company once. I suppose Mr. Wimberly did; he might have delivered it to Mr. Powell. I can't tell whether I got this envelope out of the post office or not; I could not give the exact date when it landed in our bank; I don't know how long it stayed in Houston after being postmarked, and I don't know

how long it was on the way here; I don't know whether I got it out of the post office, or whether Mr. Powell got it out of the post office, or whether somebody else got it out of the post office; the bookkeeper frequently goes for the mail. * * * I said I don't know if I got it out myself and laid it aside. I couldn't give the exact date when it arrived at the bank. I think this voucher was in our bank on the 1st day of May; I am pretty sure it was. I think if it had come in there after that time we would have noticed it. I would not tell the jury positively that this voucher was in our bank on the 1st day of May, 1918. I do not base my judgment solely on the fact that it was mailed in Houston on the 24th. I base it on the fact that the people were calling for the vouchers daily almost, and if we had received that after the 1st of May, after they had been calling for them any time, we would have noticed it. * * * The reason I can tell the jury pretty positively that it was there on the 1st day of May is because, if it had come in after then, we would have noticed it; we would have been looking for it. The people came and had been inquiring about this. I did not make a search then; and at the very time they were searching for them they were there on my desk where I work; they were there, addressed to the Farmers' State Bank, and from the Texas Company. I don't know how many days they lay there before they were found. I suppose they were found about the 7th or 8th, according to when they were mailed out. They must have been there a week or more if they got there before the 1st. I would not say that they got there on the 30th, 31st, 1st, 2d, 3d, 4th, nor 5th. I know they did not arrive on the day I saw them on my desk. I don't know whether I went for the mail the day I found them or not; I know they did not arrive that day, because they had been there several days; they were dusty; the envelope showed to have been lying there two or three days, or several days."

R. S. Sanders testified as follows:

"I am bookkeeper at the Farmers' State Bank of Center, and occupied the same position during the months of April and May of this year. During the months of April and May my attention was called to a package of mail matter which contained a batch of checks similar to this. It seems like everybody in the lower end of the county was calling for the checks. The parties from Mr. Wimberly's section of the country began calling for their rental checks along before the 1st of the month, along before the 1st of May, I believe it was. This check seems to be dated April 22, 1918. Prior to the 1st of May those checks were called for every day; that is, somebody called for a certain particular check; there were sufficient calls to call the particular attention of everybody inside the bank, all the employés of the bank, to the matter. This package was later found in the bank. From the time the checks first began to be called for, prior to the 1st day of May, and up until the time this check was found, I couldn't tell you whether I got this package out of the mail myself or not; I go after the mail sometimes, and Ed Norris

goes after the mail sometimes. If I had gotten this package out of the mail after the inquiries had begun to be made, I would have noticed it, why; to stop the inquiries is the principal reason. I remember the day on which Mr. W. I. Davis came around to the bank and cashed a check or got one that was mailed to him. Inquiries for the checks contained in this package had been made before that date at our bank; and from that time on up I could say with certainty that I did not get that package out of the post office. As to the date of arrival of that package of checks in the Farmers' State Bank I couldn't tell you the date, but, as to the days, it was ten days or two weeks that they had been calling for them before we found them."

The day the W. I. Davis check referred to was returned from the bank at Center and paid through the Houston clearing house was April 29, 1918. It therefore must have been at the Center bank not later than April 28th.

On cross-examination this witness testified:

"The package of checks was found by Ed Norris on the desk in the bank. I don't know the exact date it arrived. I don't know the number of days it had been there when it was found. I think it had the stamp of the Texas Company on it. The people who had been coming to the bank had been asking for oil company checks, and they had been demanding and saying that it was time for them to be there. In a way, I know that it was there on the 1st, and in a way I know it was not; that is, I couldn't say that it was there, but later I knew that it was there on the 1st; I knew it was there on the 1st from the postmark and from the calls that we had. I'll tell you the reason this was left there and we didn't find it: It was during the Fourth Liberty Loan, and the bank was getting hundreds of circulars from the Federal Reserve Bank, and that is the color and shape of the Federal Reserve envelopes. Some of the Federal Reserve envelopes come without stamps, and some come with stamps on them. Bonds have stamps on them; bonds come under stamps, but Liberty Loan literature comes franked. This envelope has the proper postage on it; but we never noticed that; if we had, we would have opened it at the time we got it. I couldn't tell you who got the mail on the 7th of May, nor on the 1st of May. I could not tell the jury whether I got that package out of the post office or not. I could tell them that I did not get it out of the post office on the 7th of May, because I would have noticed it if I had gotten it, because we were watching out for Texas Company mail. I never thought about it being on the desk is the reason I wasn't watching there. I couldn't say who got it out of the post office; if I went to the post office the day it came in, I got it; either Mr. Powell or Mr. Norris or I got it out of the post office. I can't say that I got it on the 1st; I don't know whether Mr. Powell got it on the 1st; I couldn't tell you whether Mr. Powell got it on the 28th or 29th, nor on the 30th; I don't know whether or not they got it on the 1st, 2d, 3d, or 4th, or on the 5th or 6th. If I am not mistaken, it was on the 8th when it was found on the desk. I could not tell the jury the date it came in there."

Redirect:

"It did come in some time prior to the time those various parties came in and began calling for them."

Recross-examination:

"I know it did. I don't know how long it was getting out of Houston; it might have been five days coming out of Houston; it might have been six or seven days or eight days coming out of Houston. As far as knowing exactly what date it got here, I don't, but I know it was here when they were calling for their checks; they called for their checks on the 8th and 9th from the 1st."

Redirect examination:

"The parties had been calling for their checks prior to the time W. I. Davis cashed the check he received, and from that time on we carefully watched all the mail we received, and if any Texas Company mail had come in we would have opened it."

[3] The facts as set out above are clearly sufficient to establish a presumption of timely delivery of said voucher to said bank. The envelope containing the same was stamped as first-class mail; was postmarked out of Houston 9 p. m. April 24, 1918, and in due course of mail should have reached the bank at Center on the morning of April 25th.

In the case of Opet v. Denezer, 93 S. W. 527, the court used this language:

"A presumption of fact attaches to a letter properly addressed and mailed that it is delivered in due course of mail to the addressee."

This is amply supported by the authorities. See Life Insurance Co. v. Fields, 26 S. W. 280; Ins. Co. v. Heath, 29 Tex. Civ. App. 445, 69 S. W. 235; Smith v. Heitman, 44 Tex. Civ. App. 358, 98 S. W. 1075; Trezerant v. Powell, 61 Tex. Civ. App. 449, 130 S. W. 235; Eatman v. Eatman, 135 S. W. 168; International Ry. Co. v. Brice, 111 S. W. 1094.

However, the presumption is subject to rebuttal by proof of nondelivery or by proof of delivery out of due course of mail. The letter was actually delivered to the bank at some time. It was found in the bank on the 7th or 8th day of May among a lot of other papers supposed to be discarded Federal Reserve Bank mail, dusty, sealed, and stamped as first-class matter. The facts and circumstances under which it was found do not rebut the presumption of due delivery; but, on the contrary, they are consistent with and support such presumption. Before this presumption can be broken down to the extent that the plaintiff is entitled to a verdict, there must appear some evidence in the record sufficient in law to establish the fact that said envelope was delivered to the bank after the 1st day of May, 1918. The real question is: Is the finding of fact, upon which the judgment is solely based, that said voucher was not received by the bank at

Center on or before May 1st, wholly unsupported by the evidence, or so against the great preponderance of the evidence as to be manifestly wrong?

The Texas Company, under the terms of the involved lease contract, was due to tender for deposit for the credit of the appellee, in the Farmers' State Bank of Center, certain rental money, in the form of a check, on or before May 1, 1918. On April 24, 1918, a check to cover this amount, with some 40 or 50 others of like character, was mailed in one envelope by appellant to said bank, sealed and stamped as first-class mail matter, and same was postmarked out of Houston at 8 p. m. on said date. The parties to whom said checks were payable received letters from the Texas Company in the latter part of April, advising them that the checks had been mailed, and they came to said bank with said letters demanding said checks as early as April 27th or 28th, and thence regularly and continuously till the finding of said envelope in said bank, about May 7th. The same, when found, was among some discarded Liberty Bond mail, covered with dust. It was not marked "Missent," clearly indicating it had gone directly through in the mail.

Because of the persistent calls at the bank for these checks, beginning in the latter part of April, the attention of the parties in the bank who received and handled its mail was called to the matter of said envelope. They carefully watched the mail therefor, were in position to testify, and did testify, that, so far as each was concerned, he did not receive the envelope through the mail after said inquiries began, and was therefore in a position to swear, so far as his knowledge extended, that the check was received before said calls began, and before May 1st. This statement should be qualified as to Powell. The trial court permitted the witness to state his belief that the check arrived before May 1st, but did not permit him to give his reasons for such belief.. When Wimberly called at the bank on May 2d and 6th, he was advised by Powell, and he says he discussed the matter with Powell only, that the check was not there, and he and the witness Boles state that Powell said on May 9th the check came in two or three days before. Wimberly admits that after the envelope was found Powell told him it was postmarked April 24th, "had gotten thrown aside, and that they had overlooked it and did not find it till you all had been in there inquiring for the checks."

Are these facts sufficient to support the issue that the voucher was received after May 1st? Do they overcome the presumption that they were received by the bank on April 25th or 26th?

Wimberly's agent, Powell, acting under an erroneous belief, told him on May 2d and on May 6th that the check was not at the bank.

When the check was found and the error discovered, the same agent advised his principal of the error and of the facts and circumstances, demonstrating that the check was at the bank before May 1st. Wimberly says, as we have quoted, that Powell told him the date of the mailing of the check, the fact of its getting misplaced and thrown aside in the bank, and Powell says, "I told Wimberly I believed the check arrived prior to the 1st of May."

Aside from the question of admissibility, and looking solely to the question of the sufficiency of the evidence, is the erroneous statement of the agent to the principal that the check did not arrive before May 1st sufficient to overcome the presumption that it did arrive on or before said date? It should be remembered Powell's evidence does not come within the rule of conflicting statements, the truth of which is determined by the jury, but rather a statement made under a mistake of fact, and corrected when the mistake is discovered.

Aside from the question of presumption, we are impressed that the facts of this record, which a reasonable mind is willing to accept, demonstrate that said check was received by the bank on or before May 1, 1918, and a finding to the contrary is against the great preponderance of the evidence. The only persons at the bank who go after, receive, and handle mail are Powell, Norris, and Sanders. They are the only ones who can shed any light on the fact as to when the envelope arrived at the bank. Wimberly cannot, because his testimony relates solely to what one of these parties had to say; and the judgment in his favor, if sustained, must rest on the statement of these bank officials. If these three witnesses testified to facts which exclude a finding that said check arrived after May 1st, but to facts from which it must appear that it arrived on or before said date, the judgment of the court was wrong.

Powell testified:

"The contents of the envelope, that is, the checks, including the Wimberly check, had been the subject of discussion there at the bank, on account of inquiry having been made by Mr. Wimberly. I could not state whether or not the envelope, with these checks, arrived at our bank on or before the 1st day of May; my best judgment is that they arrived prior to the 1st day of May. I told Mr. Wimberly that I believed the checks arrived prior to the 1st day of May."

Norris testified:

"If this envelope had come in the due course of mail, mailed on the 24th, in due course of mail it would have reached our bank on the 25th or 26th; and if it had reached there after the people began inquiring for it, I would have noticed it. I am sure it had been there at the bank several days when I discovered it. It was among a lot of other papers. I discovered and opened this package, and made a remark to Mr. Powell about the contents of it. * * * I do not base my judgment solely on the fact that it was mailed in Houston on the 24th; I base it on the fact that the people were calling for the vouchers daily almost, and if we had received that after the 1st of May, after they had been calling for them any time, we would had noticed it. * * * The reason I can tell the jury pretty positive that it was there on the 1st day of May is because, if it had come in after, then we would have noticed it; we would have been looking for it."

The parties state facts and circumstances from which the only reasonable and rational conclusion to be drawn is that the Wimberly check reached the Farmers' State Bank at Center before May 1st. The fact that Powell, or other officers of the bank, may have told Wimberly on the 2d and 6th of May that the check was not there, is not inconsistent with, nor does it weaken, the force of our contention. It merely indicates an erroneous belief existing at those times.

With the views above expressed, we are not able, nor are we willing, to say that the court was in error, and to sustain the contentions of the appellant.

The sixth assignment of error is as follows:

"The court erred in refusing to permit the witness F. C. Powell to testify that numerous persons who had checks inclosed in said Texas Company envelope began calling at the bank for said checks on April 28, 1918, because said testimony, in connection with further testimony of the witness, if he had been permitted to testify, that these inquiries directed his attention to said envelope, that he thereafter carefully observed the mail, and knows said envelope did arrive at the bank prior to April 28, 1918, would have established the only controverted issue of fact in said cause, to wit, that said Texas Company envelope was received by the bank on or before May 1, 1918, as shown by defendant's bill of exception No. 2."

[4] As shown by this bill of exception, appellant undertook to show by the witness Powell that numerous persons to whom checks were inclosed in said envelope began calling at the bank on April 28th with letters from the Texas Company advising them that checks were at the bank, and demanding delivery of the same; that this produced a general discussion about the bank, and the witness, assuming the envelope was delayed in the mail and would soon arrive, began carefully to observe all mail coming to the bank from and after April 28th, till the envelope was found, about May 8th; and, though carefully observing all mail during this period, there did not arrive in it the envelope found in the bank on May 8th, and that therefore witness is convinced the envelope arrived at the bank prior to April 28th. Plaintiff objected that any "call by any other person at any date at the bank,

except the plaintiff and except as to plaintiff's check, would be immaterial," and the court sustained the objection and limited the testimony to calls by plaintiff about plaintiff's check.

In our judgment, this testimony, directed at the very heart of the controversy, was not immaterial. The witness was undertaking to recite facts which would demonstrate to the jury that his attention on April 28th was called to the loss or delay of the envelope; and if any person had called witness' attention to said fact on April 28th, it would be just as cogent to direct attention, and equally as material a circumstance in evidence to this purpose, as if plaintiff Wimberly had done it. Certainly, in order to prove that your attention was directed to a certain thing on a certain day, it would be equally as material, and much more convincing, to prove, not that one, but that numerous persons directed your attention to such thing; in other words, if one person, Wimberly, by doing a particular thing, would direct the mind to a thing, then much more so and to a greater degree would numerous persons doing the same thing direct the mind to such thing.

The court was in error in this respect, and should have permitted the testimony.

The seventh assignment of error is as follows:

"The court erred in refusing to permit the witness F. C. Powell to state to the jury the facts on which he based his statement that in his best judgment said Texas Company voucher or check arrived at the Farmers' State Bank of Center on or before May 1, 1918, because said testimony directly supports and establishes the only controverted issue of fact in said cause; that is, that the said check arrived at said bank on or before May 1, 1918."

[5] Defendant's witness Powell was testifying. He had just testified that he could not positively state that the check arrived at the bank prior to May 1st. Thereupon defendant's counsel undertook to develop from the witness facts and circumstances which would clearly demonstrate the envelope did arrive before May 1st, and exclude the idea that it arrived after said date. Witness was first asked, as shown by the sixth assignment, to state a fact that would prove that he knew of the delay or loss of the envelope on April 28th, and on objection this was excluded. Then the witness was asked about

his best judgment as to the date of its arrival, and he answered: "My best judgment is that they arrived prior to the 1st day of May." Then, logically and very naturally, came the question: "State to the jury your reasons why your judgment is that they arrived prior to the 1st day of May." The plaintiff objected, and the court sustained the objection on the ground that it might call for the matters objectionable.

We think the court was in error in excluding this testimony, and that the same should have been admitted.

As said before, there is but one issue in this case, the date when said check was delivered to the bank, and it cannot be questioned that, if there is any evidence to support this issue, it is indeed shadowy and at conflict with the great preponderance of the evidence in this cause.

. The witnesses Norris and Sanders were permitted to testify that they believed the envelope arrived at the bank before May 1st, and to state facts of the most convincing character upon which they based such belief. Powell was permitted to state a belief, but was not permitted to state any fact as a basis therefor. If Powell had been permitted to testify to these facts, there would have been a complete chain of proof by every officer and employé of the bank, from which but one reasonable hypothesis could be drawn; that is, that the envelope arrived at the bank on or before May 1st. The chain consisted of three links—the testimony of Powell, Norris, and Sanders that by reason of certain facts each witness knew that the check did not arrive at the bank after May 1st. The court did not permit defendant to build the link dependent on Powell's testimony; therefore the connection and force of the proof was broken.

As a practical proposition, the statement of a belief or judgment without giving the facts as a basis therefor has but little, if any, probative force to the intelligent or inquiring mind.

Taking the testimony as a whole, and viewing the entire record, as before said, we are of opinion that the court should have admitted the testimony, and, believing as we do, we are constrained to reverse the judgment of the trial court, and remand this cause for another trial.

Reversed and remanded.

WALKER, J., not sitting.